# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| Larry Kevin Goode, ) | |
| ) | |
|         Plaintiff, ) | |
| ) | C.A. No.: 6:08-cv-03309-PMD |
| v. ) | |
| ) | |
| Michael J. Astrue, ) | **ORDER** |
| Commissioner of Social Security, ) | |
| ) | |
|         Defendant. ) | |
| _____ ) | |

       Plaintiff Larry Kevin Goode ("Claimant") brought this action, pursuant to 42 U.S.C. § 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Social Security Commissioner denying his claim for Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act. On September 18, 2009, in accordance with 28 U.S.C. § 636(b)(1)(B), the Magistrate Judge entered a Report and Recommendation ("R&R") recommending that the Commissioner's decision denying Claimant benefits be reversed and that the Claimant be awarded benefits. Defendant Michael J. Astrue ("Commissioner") filed an Objection to the R&R on September 29, 2009. Having reviewed the entire record, including Defendant's Objections, the court finds the Magistrate Judge fairly and accurately summarized the facts and applied the correct principles of law. Accordingly, the court adopts the R&R's recommendation that the Commissioner's decision denying Claimant benefits be reversed. However, the court declines to adopt the recommendation of the Magistrate Judge that Claimant be immediately awarded benefits, and instead remands Claimant's case to the Commissioner.

## BACKGROUND

A.  **Procedural Background**

Claimant protectively filed his application for SSI benefits on February 10, 2004. The application was denied initially and on reconsideration by the Social Security Administration. On December 9, 2004, Claimant requested a hearing. Claimant and his attorney appeared before the administrative law judge ("ALJ") on May 25, 2006, and after reviewing the case *de novo,* the ALJ found that Claimant was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner when it was approved by the Appeals Council on September 15, 2006. Claimant then filed an action for judicial review.

On December 4, 2007, this court remanded the case for further administrative proceedings. Specifically, this court found that the ALJ had erred by (1) failing to perform a proper listing analysis; (2) failing to obtain vocational expert testimony in light of his non-exertional impairments; and (3) failing to properly analyze Claimant's credibility. Following remand, on June 10, 2008, a supplemental hearing was held before the ALJ, at which the Claimant, his attorney, and a vocational expert appeared. On July 23, 2008, the ALJ again found that Claimant was not entitled to benefits. The ALJ's decision became the final decision of the Commissioner when it was adopted by the Appeals Council.

B.  **Medical Evidence**

Claimant was 45 years old at the time of the ALJ's second decision. (Tr. 48). He has a high school equivalent education (Tr. 101) and past relevant work experience as a construction carpenter/laborer (Tr. 96). The record reveals that Claimant has a history of obesity (he is 5'7"

tall and weighs approximately 260 pounds), coronary artery disease, and a heart attack in 1997. (Tr. 111). After his 1997 heart attack, Claimant returned to work and did not have further symptoms until February 2004. (Tr. 96).

On February 1, 2004, Claimant presented to the Medical University of South Carolina ("MUSC") emergency room with complaints of chest pain. During the evaluation, he developed fibrillation and was admitted for further evaluation. A heart catheterization procedure revealed coronary artery stenosis (narrowing) of 60-90% in various places. He subsequently underwent double coronary artery bypass grafting surgery without complications, and his recovery was uncomplicated. He was discharged on February 6, 2004, with recovery instructions to "walk as tolerated," wear elastic stockings when not in bed, and not drive or lift more than 10 pounds. (Tr. 111-30).

Ten days later, on February 16, 2004, Claimant returned with complaints of left chest and rib pain, and reported that he had run out of pain medication the previous night. He was given a refill and discharged. (Tr. 138-40). Three days after that, on February 19, 2004, Dr. John M. Kratz, a cardiothoracic surgeon, saw Claimant for a follow-up visit. Claimant appeared to be "feeling well without particular problems." Dr. Kratz characterized him as morbidly obese and prescribed a medication for high cholesterol. (Tr. 158).

Claimant returned to the emergency room three more times in February and March 2004 and was treated for chest wall pain that worsened whenever he decreased his use of pain medication or ran out of pain medication. (Tr. 151, 132-57, 202-06).

In May 2004, a CT scan indicated that one of Claimant's bypass grafts was patent (open). He had 50% stenosis of the LAD artery, compared with a prior assessment of 70% stenosis in

3

that artery. (Tr. 160).

Between July 2004 and January 2005, Claimant periodically saw a family practitioner at the Franklin C. Fetter Health Center for treatment of chest pain, edema in his feet, and migraine headaches. (Tr. 193-99).

A nuclear stress test conducted in July 2004 demonstrated a normal ejection fraction of 64% after stress. Claimant's resting heart rate was 61 beats per minute and at peak stress went to 81 beats per minute. His blood pressure remained the same at rest and at peak stress. EKG results were normal at rest and at stress, and motion studies of the left ventricle were normal. Claimant repeated the entire protocol of the stress test. (Tr. 175, 200).

In August 2004, Claimant presented to MUSC cardiologist Dr. Salvatore Chiaramida at the request of Dr. Kratz. Claimant reported that he smoked up to one and one-half packs of cigarettes per day. It was noted that Claimant initially did well after surgery, but that he developed chest discomfort and dyspnea (shortness of breath) with mild exertion. On examination, Claimant's heart rhythm was regular, with no abnormal sounds. There was some edema in his extremities, and he had a normal ejection fraction of greater than 50%. An EKG done at the time of the examination demonstrated normal sinus rhythm and non-specific ST-T wave abnormalities. (Tr. 218-21).

Dr. Chiaramida recommended a repeat heart catheterization, which was performed on August 17, 2004, and showed that the LAD artery had a 40-50% stenosis and the circumflex artery had mild irregularities. The LIMA graft had a "30% to 40% lesion," and the RIMA graft to the left circumflex artery was "100% occluded at the origin." Another EKG showed the Claimant maintained normal sinus rhythm. Dr. Randall N. Goodroe, a cardiologist, concluded

4

that:

> Due to improvement in the left main lesion from the catheterization in 02/2004, we have a high suspicion that the patient has some element of coronary vasospasm. . . . Although we have a low suspicion that his pain is true angina, the pain seems to be musculoskeletal or even neuropathic in origin. He was felt to be stable for discharge to home. . . . If the patient continues to have pain, a pain management consult should be considered for musculoskeletal versus neuropathic chest pain.

(Tr. 174-76).

In October 2004, state agency physician Dr. F. Keels Baker reviewed Claimant's records and found that he had the capacity to lift 20 pounds occasionally and 10 pounds frequently, and stand/walk about six hours and sit about six hours in an eight-hour day. He found that Claimant could never climb ladders, ropes, or scaffolds, and that he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Dr. Baker further found the Claimant needed to avoid concentrated exposure to extreme cold and heat. (Tr. 182-85).

In July 2005, Claimant returned to Dr. Chiaramida and reported ongoing chest discomfort that was not typically exertional, dyspnea with mild to moderate exertion (e.g., climbing one flight of stairs), and easy fatigue. Claimant denied having any palpitations, lightheadedness, or syncope (fainting). Dr. Chiaramida noted that "[h]e smokes but has been advised to discontinue this." On examination, Claimant weighed 262 pounds. Claimant's blood pressure was 126/88 and his heart rate was 64 beats per minute. He did not exhibit any chest wall tenderness and his heart rhythm was regular, without any abnormal sounds. There was evidence of "mild" peripheral edema, but Claimant maintained equal and symmetrical motor power and a normal gait. An EKG demonstrated sinus bradycardia (a slow heart rate), but was "otherwise within normal limits." Dr. Chiaramida recommended an echocardiogram and stress test and referred

5

Claimant to a pain clinic. (Tr. 216-217). An echocardiogram performed on June 25, 2005 revealed normal left ventricular dimensions and motion and a normal ejection fraction of greater than 50%. (Tr. 227).

In August 2005, Claimant underwent an exercise stress test at MUSC. The summary report indicated that Claimant "completed 6 minutes 30 seconds of the Bruce protocol (7.7 METS)." The test was terminated when Claimant developed shortness of breath and fatigue. Claimant's target heart rate at exercise was 151 beats per minute, and he peaked at 150 beats per minute before the test was terminated. At rest, the EKG showed normal sinus rhythm. At peak stress, the EKG showed sinus tachycardia (fast heart rate) and a 1.5mm ST wave depression abnormality. (Tr. 223-26).

In October 2005, Claimant presented to MUSC family practitioner Dr. A. Cleve Hutson for a comprehensive medical examination. He reported intermittent chest pain, dyspnea, and swollen feet. He weighed 278 pounds. He reported that was doing "occasional walking or other light activity" for exercise. On examination, Claimant had a normal heart rate and rhythm, with no abnormal sounds. He walked with a normal gait, had no edema in his extremities, and the remainder of the examination was unremarkable. (Tr. 414-16).

In November and December 2005, Claimant told Dr. Hutson that he had angina every few days with minimal to mild exertion and had a couple of severe episodes of pain associated with nausea. Dr. Huston noted that Claimant appeared well and was in no acute distress. Heart and pulse findings were unremarkable. Dr. Hutson did not make any changes in Claimant's medications. (Tr. 408-13).

In January 2006, Claimant reported that he had angina "weekly or less" and that his

symptoms were relieved by rest and nitroglycerin.  (Tr. 405).  In February, Claimant reported having two bouts of "stabbing" chest pain, but he stated that he felt better in general and had angina "weekly or less."  (Tr. 402).  In March, Claimant reported having a "large amount" of chest pain, a cough, and a fever, as well as shortness of breath on awakening.  He reported daily angina.  Dr. Hutson found that Claimant was not in respiratory distress and his heart and pulses remained unremarkable.  (Tr. 400).  Dr. Hutson did not adjust Claimant's medications.  (Tr. 399-400).  In April, Claimant reported daily angina that occurred when walking.  Dr. Hutson noted that he was stable.  (Tr. 396-97).

In May 2006, Claimant told Dr. Hutson that he had "started to actively take care of a 5 year old child."  Dr. Hutson reported that Claimant was a nonsmoker, occasionally walked for exercise, and had unremarkable objective findings on examination.  (Tr. 393-94).

Between June 2006 and May 2008, Claimant reported at monthly visits with Dr. Hutson and at other MUSC physicians that he continued to have angina on a regular basis (generally, daily) with occasional severe episodes that were relieved with nitroglycerine and rest.  Clinically, his cardiovascular examinations remained unremarkable.  (Tr. 322-445).  Records indicate that Claimant had not smoked since 2004.  (Tr. 338).  An ultrasound of his extremities conducted in February 2007 revealed increased swelling.  (Tr. 419).  In late 2007, a physician noted that Claimant had gained approximately 50 pounds over the previous three years and had "mild" leg swelling.  (Tr. 337).  In March 2008, Claimant reported that he was starting an exercise routine that he felt comfortable with and was making dietary changes in order to lose weight.  (Tr. 439).  In April 2008, he reported that he had been "feeling well" and that he got a new tattoo on his abdomen.  (Tr. 434).

7

In May 2008, Dr. Hutson observed unremarkable objective findings (Tr. 440) but opined that Claimant "remain[ed] totally disabled and his medication con[dition] is further complicated by having hep[atitis] C." (Tr. 426). Dr. Hutson noted that Claimant was unable to exercise due to shortness of breath and that he was "unable to sustain any effort." (Tr. 426).

C. **Administrative Hearing Testimony**

At the first administrative hearing, in September 2005, Claimant testified that his medications made him feel bloated and nauseous and that he had shortness of breath, constant chest pain, pressure that caused "severe" sweating and palpitations, and a feeling that his heart was "skipping." (Tr. 244, 247-52). Claimant also testified that he could walk only short distances and could not sit for very long and that he was "always in bed." (Tr. 252). As to his activities, Claimant testified that he "pretty much stay[ed] around the house," "watched a lot of television," and visited with friends and family. (Tr. 245). Claimant testified that he lived by himself, cooked his own meals (such as eggs for breakfast), laundered clothes, and did his own shopping. (Tr. 245, 250).

At the supplemental hearing in June 2008, Claimant testified that he had "really bad pains" in his chest, legs, arm, and jaw, as well as fatigue, swollen feet, and some problems with memory. (Tr. 450). Claimant said some of his symptoms had gotten worse and that none had improved. (Tr. 450). He said he became tired with "any kind of major walking." (Tr. 451). He said he could not exercise much, and he reported loss of concentration after 15 to 45 minutes. (Tr. 453-454). He also testified that his liver problems caused fatigue and side pain. (Tr. 454). When asked whether he could perform a sedentary job, Claimant testified that he would not be able to because he could not sit in the same place, bend over, concentrate, or use a computer.

8

(Tr. 454-455). Claimant testified that "9 times out of 10, they're not going to hire me anyway because I'm a liability." (Tr. 455). Claimant testified that he did housework slowly and that he spent his time watching television or sleeping. (Tr. 456). He testified that he weighed 300 pounds at that time. (Tr. 461).

A vocational expert, Arthur Schmitt, also testified at the supplemental hearing. The ALJ asked the vocational expert to assume a hypothetical individual of the Claimant's age and education who could perform unskilled light work. (Tr. 464). Mr. Schmitt testified that such an individual could perform the jobs of parking lot attendant (1,292 jobs in the state and 631,870 nationally), carton packer (12,040 jobs in the state and 165,490 jobs nationally), and storage facility clerk (2,522 jobs in the state and 277,000 jobs nationally). (Tr. 464). The ALJ also asked Mr. Schmitt to assume that Claimant would require on an unscheduled basis work breaks, which would average 2 hours each 8-hour day and whether, with that additional limitation, Claimant could do any of the jobs just identified. (Tr. 464-65). Mr. Schmitt testified that with that additional limitation Claimant "could not do any of the jobs that I identified or any other job in the national economy." (Tr. 465). The ALJ then asked Mr. Schmitt to assume that Claimant would have to be absent from work an average of 3 days each month, and Mr. Schmitt responded, "[i]f it just includes 3 days' absences, he could do those jobs." (Tr. 465). Lastly, Claimant's counsel asked how Claimant's inability to concentrate for 20% of the workday would affect his ability to do the jobs cited, and Mr. Schmitt responded that assuming that hypothetical "then I would eliminate those jobs cited or any other jobs in the national economy." (Tr. 465).

## DISCUSSION

### I.  Standard for Determining Disability

A person is considered disabled when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 423(d)(1)(A). In order to determine whether a claimant is disabled, an ALJ employs a five-step inquiry:

> The first step determines whether the claimant is engaged in "substantial gainful activity." If he is, benefits are denied. If he is not engaged in such activity, the process moves to the second step, which decides whether the claimant's condition or impairment is "severe"—i.e., one that significantly limits his physical or mental ability to do basic work activities. If the impairment is not severe, benefits are denied. If the impairment is severe, the third step determines whether the claimant's impairments meet or equal those set forth in the "Listing of Impairments"... contained in subpart P, appendix 1, of the regulations.... If the claimant's impairments are not listed, the process moves to the fourth step, which assesses the individual's "residual functional capacity" (RFC); this assessment measures the claimant's capacity to engage in basic work activities. If the claimant's RFC permits him to perform his prior work, benefits are denied. If the claimant is not capable of doing his past work, a decision is made under the fifth and final step whether, in light of his RFC, age, education, and work experience, he has the capacity to perform other work. If he does not, benefits are awarded.

*Bowen v. City of New York,* 476 U.S. 467, 470-71 (1986) (citations omitted). Claimant bears the burden of proof at the first four steps of the analysis. At the fifth and final stage of this process, the burden shifts to the Commissioner to prove that the claimant is capable of performing other work that exists in the national economy. *See Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

## II. The ALJ's Decision

The ALJ concluded that Claimant is not under a disability and denied Claimant's application for supplemental security income. At step one, the ALJ determined that Claimant has not engaged in substantial gainful activity since February 10, 2004. (Tr. 260). Next, at step two, the ALJ found that Claimant has the following severe combination of impairments: coronary artery disease status-post coronary artery bypass grafting with resulting pain and fatigue, COPD, and obesity. (Tr. 260). However, the ALJ found that Claimant's obesity has not had more than a minimal effect upon his ability to perform work activity and that "Claimant's obesity has not had a negative effect upon the Claimant's ability to perform routine movement or upon his ability to sustain function over an 8-hour day." (Tr. 260-61). The ALJ also noted that "[w]hile the claimant alleges he suffers from migraines, there is no clear documentation in the record that this is a serious condition." (Tr. 261).

At the third step, the ALJ found that Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. To meet Listing 4.04C, an individual must have coronary artery disease demonstrated by angiography (obtained independent of Social Security disability evaluation) showing: (a) 50 percent or more narrowing of a non-bypassed left main coronary artery; or (b) 70 percent or more narrowing of another non-bypassed coronary artery; or (c) 50 percent or more narrowing involving a long (greater than 1 cm) segment of a non-bypassed coronary artery; or (d) 50 percent or more narrowing of at least two non-bypassed coronary arteries; or (e) 70 percent or more narrowing of a bypass graft vessel. The claimant's coronary artery disease must then be documented to result in very serious limitations in the ability to

independently initiate, sustain, or complete activities of daily living. The ALJ found that Claimant did not meet this listing. The ALJ found that Claimant met the first part of the listing because he had 40-50% stenosis of the left anterior descending artery and 100% occlusion of the right internal mammary artery; however, the ALJ found that "the record does not document that this condition results in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living, as evidenced by [claimant's] testimony at the most recent hearing that [he] was a able to perform some housework, his testimony from the first hearing that he was able to cook and do laundry, and a report from May 2006 that he was able to actively care for a 5-year-old child." (Tr. 261).

After determining in step three that the claimant's impairments do not meet one of the listed impairments, the process moves to the fourth step, at which the ALJ assesses the individual's "residual functional capacity"—this assessment measures the claimant's capacity to engage in basic work activities. At this step, the ALJ found that Claimant has the residual functional capacity to: sit, stand, and walk each for 6 hours of an 8-hour day; frequently lift/carry 10 pounds; and occasionally lift 20 pounds. (Tr. 261-62). The ALJ also found that Claimant's pain, fatigue, and concentration deficits would further limit him to unskilled work. (Tr. 262). The ALJ also found that Claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms are not entirely credible to the extent they are inconsistent with the residual functional capacity assessment. The ALJ found that the doctors' reports "fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were disabled" and that "[w]hile the claimant has alleged various side effects from his medications . . . there is no corroboration of these side effects in the treatment notes." (Tr. 263).

Finally, the ALJ found that while Claimant is unable to perform any past relevant work, considering the Claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Claimant can perform. Therefore, the ALJ concluded that Claimant "has not been under a disability, as defined in the Social Security Act, since February 10, 2004, the date the application was filed." (Tr. 265).

### III. <u>Magistrate Judge's Report and Recommendation</u>

Claimant filed the current action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of the final decision of the Commissioner denying his claim for supplemental security income benefits. Claimant argues that the ALJ erred by (1) failing to perform a proper listing analysis; (2) failing to consider whether his combined impairments were of equal medical significance to a listed impairment; (3) conducting a flawed residual functional capacity assessment; and (4) conducting a flawed credibility analysis.

In regards to the ALJ's listing analysis, as set forth above, the ALJ found that Claimant met the first part of Listing 4.04C with regard to angiographic evidence. However, Claimant argues that the ALJ overlooked evidence in the record in determining that Claimant did not meet the second part of the listing: "resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living." The Magistrate Judge agreed with Claimant and found that the "ALJ's finding that the [claimant] did not meet Listing 4.04C (Coronary Artery Disease) is not based upon substantial evidence." R&R p. 14. The Magistrate Judge first noted that the "record is replete with evidence of the [claimant's] limitations as a

result of his coronary artery disease." Id. While the R&R contains a more thorough listing of the evidence of claimant's limitations, which is hereby incorporated into this order by reference, that evidence includes claims by Claimant that his headaches are worse; his breathing has worsened; he has problems walking, talking, catching his breath; he cannot reach above his head or sit for long periods of time; he tires easily; he suffers from memory loss; he has difficulty showering because he cannot stand up for too long; he has difficulty walking because of painful swelling in his feet and ankles; he has constant heart pain; he spends most of his time in bed; he becomes short of breath and can only walk a distance of between 20 feet and 30 yards before having to rest; his chest wall pain worsens with any motion; he suffers from angina with activity and at rest; he suffers from dyspnea on exertion; and, he suffers from bilateral blurry vision. Id. at 14-17.

The Magistrate Judge found that the "ALJ's finding that the [claimant] did not have 'very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living' was based upon the following: 'his testimony at the most recent hearing the [claimant] was able to perform some housework, his testimony from the first hearing that he was able to cook and do laundry, and a report from May 2006 that he was actively able to care for a 5-year-old child.'" Id. at 17. The Magistrate Judge also noted that at the most recent hearing, the ALJ asked Claimant, "Are you able to do your own housework?" Claimant replied, "slowly." Id. (citing Tr. 456). The Magistrate Judge found that the ALJ asked no-follow up questions as to what type of household chores Claimant was able to do or how often he did them. Id. At the first hearing, Claimant stated that he cooked "real simple things" like eggs, and that he ate "a lot of cereal." Id. (citing Tr. 250). The Magistrate Judge also noted that in May 2006, Dr. Hutson

14

stated that the Claimant had "started to actively take care of a 5 year old child," but that "there is no other reference regarding [Claimant] taking care of a child in the record, and there is no information as to how long he cared for the child or the scope of his responsibilities in taking care of the child." Id. at 18.

Therefore, the Magistrate Judge concluded that the isolated references the ALJ used to decide that Claimant fails to meet the listing do not meet the substantial evidence standard. According to the R&R, "the overwhelming evidence in the record shows that the [Claimant] has 'very serious limitations in his ability to independently initiate, sustain, or complete activities of daily living' as required by Listing 4.404C. He suffers from angina, dyspnea, fatigue, and pain that worsens with any activity." Id. The Magistrate Judge recommended that Claimant should be found to be disabled at step three of the sequential evaluation process and that, therefore, the remainder of Claimant's allegations do not need to be addressed. Id. Finally, the R&R found that reopening the record would serve no purpose; therefore, the R&R suggests reversing the Commissioner's decision denying benefits and awarding Claimant benefits without remand. Id.

## IV. <u>Standard of Review</u>

### a. Magistrate Judge's Report and Recommendation

The Magistrate Judge only makes a recommendation to the court. It has no presumptive weight, and the responsibility for making a final determination remains with the court. *Mathews v. Weber*, 423 U.S. 261, 270–71 (1976). Parties are allowed to make a written objection to a Magistrate Judge's report within ten days after being served a copy of the report. 28 U.S.C. § 636(b)(1). From the objections, the court reviews *de novo* those portions of the R&R that have been specifically objected to, and the court is allowed to accept, reject, or modify the R&R in

whole or in part. *Id.* Additionally, the court may recommit the matter to the Magistrate Judge with instructions. *Id.* A party's failure to object is accepted as an agreement with the conclusions of the Magistrate Judge. *See Thomas v. Arn*, 474 U.S. 140 (1985).

### b. Judicial Review under Social Security Act

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one. The Act provides, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Although this court may review parts of the Magistrate Judge's R&R *de novo*, judicial review of the Commissioner's final decision regarding disability benefits "is limited to determining whether the findings are supported by substantial evidence and whether the correct law was applied." *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). "Substantial evidence" is defined as:

> 'evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'

*Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). In assessing whether there is substantial evidence, the reviewing court should not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (alteration in original)).

16

V.     **Commissioner's Objections to the Report and Recommendation**

The Commissioner first objects to the Magistrate Judge's finding that the ALJ's determination that Claimant does not suffer from "very serious limitations in the ability to initiate, sustain, or complete activities of daily living" is not supported by substantial evidence in the record. The Commissioner argues that the record contains substantial evidence to support the ALJ's conclusion as to the degree of Claimant's limitations, and the Court may not re-determine the issue, even though the record may contain contrary evidence. Def's Obj. p. 2. The Commissioner argues that the fact that the record contains other evidence that could support a conclusion that is inconsistent with that of the ALJ is not determinative. Id. According to the Commissioner, "Although the Magistrate Judge disagrees with the ALJ on this point and cites evidence contradicting the ALJ, agency policy vests the ALJ with the responsibility for deciding the ultimate legal question of whether a listing is met or equaled." Id. In the alternative, the Commissioner argues that even if the court finds that the ALJ's decision is not supported by substantial evidence, the proper remedy is to remand the case for further proceedings, not reversal for an award of benefits. Id. at 3.

VI.    **Analysis of Commissioner's Objections**

The Court agrees with the Magistrate Judge's conclusion that the ALJ's decision is not supported by substantial evidence. As discussed above, the ALJ found that Claimant met the first part of the listing because he had 40-50% stenosis of the left anterior descending artery and 100% occlusion of the right internal mammary artery; however, the ALJ found that "the record does not document that this condition results in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living, as evidenced by

17

[Claimant's] testimony at the most recent hearing that [he] was a able to perform some housework, his testimony from the first hearing that he was able to cook and do laundry, and a report from May 2006 that he was able to actively care for a 5-year-old child." (Tr. 261).

The court's review of the Commissioner's final decision regarding disability benefits "is limited to determining whether the findings are supported by substantial evidence and whether the correct law was applied." *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). As mentioned above, "substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.

The ALJ's determination will not be overturned if supported by substantial evidence. *Oppenheim v. Finch*, 495 F.2d 396 (4th Cir. 1974). "The courts, however, face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec. of Health, Ed. & Welfare*, 567 F.2d 258 (4th Cir. 1977).

In this case, the ALJ decided that Claimant is not seriously limited in his ability to independently initiate, sustain, or complete activities of daily living from Claimant's testimony at the most recent hearing that Claimant was able to perform some housework, his testimony from the first hearing that he was able to cook and do laundry, and a report from May 2006 that he

was able to actively care for a 5-year-old child. (Tr. 261). As thoroughly discussed in the R&R, the ALJ failed to consider a breadth of evidence showing that Claimant has difficulty walking, showering, sleeping, breathing, and concentrating, i.e. "activities of daily living." R&R pp. 14-17. The ALJ failed to sufficiently explain the weight he has given to this obviously probative evidence in making his decision that Claimant is not seriously limited in his ability to independently initiate, sustain, or complete activities of daily living. Instead, the ALJ cites to a few isolated statements by Claimant that he can cook simple things like eggs and cereal and that he can slowly perform household chores to find that Claimant is not limited in his daily activities. The ALJ also uses an isolated reference in a report from May 2006 that Claimant was able to care for a 5-year-old child; however, the Court agrees with the R&R in that "there is no other reference regarding [Claimant] taking care of a child in the record, and there is no information as to how long he cared for the child or the scope of his responsibilities in taking care of the child." R&R p. 18.

The Commissioner correctly points out in his Objections to the R&R that the court may not reweigh the evidence and that just because there is evidence that could support a conclusion contrary to the ALJ's is not determinative as to the issue of whether substantial evidence supports the ALJ's decision. However, because the ALJ failed to thoroughly analyze all the evidence and failed to sufficiently explain the weight he has given to obviously probative exhibits, the court cannot say that his decision is supported by substantial evidence. The ALJ must provide a more thorough analysis of *all* of the evidence that is probative of Claimant's ability to initiate, sustain, or complete activities of daily living and provide more of an indication as to what weight he gave to the different pieces of evidence in making his conclusion, even if

19

after doing so the ALJ comes to the same conclusion that Claimant is not seriously limited in his ability to initiate, sustain, or complete activities of daily living.

In the alternative, the Commissioner argues that even if the court finds that the ALJ's decision is not supported by substantial evidence, the proper remedy is to remand the case for further proceedings, not reversal for an award of benefits. The court agrees with the Commissioner on this objection and, therefore, declines to adopt the recommendation of the Magistrate Judge that Claimant be immediately awarded benefits without remand. In this case, with a thorough analysis and description of the weight the ALJ gave to all of the evidence in the record, it is possible for the ALJ to correctly determine, again, that Claimant is not entitled to SSI benefits. Therefore, awarding benefits without remand would be improper in this case.

## CONCLUSION

It is, therefore, **ORDERED**, for the foregoing reasons, that the Commissioner's denial of benefits is **REVERSED**, and the matter is **REMANDED** for reconsideration in accordance with this Order.[1]

**AND IT IS SO ORDERED.**

**Charleston, South Carolina**
**March 11, 2010**

PATRICK MICHAEL DUFFY
United States District Judge

---

[1] "Should this remand result in the award of benefits, plaintiff's attorney is hereby granted, pursuant to Rule 54(d)(2)(B), an extension of time in which to file a petition for authorization of attorney's fees under 42 U.S.C. § 406(b), until thirty (30) days subsequent to the receipt of a notice of award of benefits from the Social Security Administration. ***This order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act.***" Language taken from *Stutts v. Astrue*, No. 06-G-1476-NW, 2007 WL 1696878, at *5 (N.D. Ala. June 13, 2007).